FILED
COURT OF APPEALS
DIVISION II

2013 APR -2 AM 8: 49

STATE OF WASHINGTON

BY_____
DEPUTY

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re Detention of | No. 43151-3-II |
| J.L., | |
| Appellant. | UNPUBLISHED OPINION |

QUINN-BRINTNALL, J. — J.L. appeals a 90-day involuntary civil commitment order. The trial court found J.L. to be gravely disabled. J.L. contends insufficient evidence supports the trial court's findings. He also argues that the State failed to show the absence of a less restrictive alternative to commitment. We affirm the 90-day civil commitment order.[1]

### FACTS

INITIAL ADMISSION

On February 2, 2012, J.L. called 911 believing that he had overdosed. Emergency medical technicians (EMTs) arrived and attempted to transport J.L. to a hospital. J.L. ran from the ambulance and ended up walking to the hospital. At the hospital, J.L. stated that he ate a poisoned cookie. He also alleged that the EMTs raped him during the trip to the hospital. The

---

[1] A commissioner of this court initially considered this appeal as a motion on the merits under RAP 18.14 and then referred it to a panel of judges.

hospital also learned that J.L. threatened his father with a knife. The hospital ruled out an overdose and J.L. agreed to stay hospitalized to allow for a mental health evaluation. The next day, however, J.L. requested to be discharged.

14-DAY INVOLUNTARY TREATMENT HEARING

The State filed a petition for involuntary treatment for a period not to exceed 14 days. On February 6, 2012, the trial court held a hearing on the petition. William Dehen, a psychiatric ANRP, testified that he evaluated J.L. and that J.L. has a history of schizophrenia. According to Dehen, J.L. told him that he possesses a full set of female reproductive organs and that hospital staff were sneaking into his room at night to sexually assault him. Dehen testified that J.L.'s symptoms support a diagnosis of schizophrenia. Dehen categorized J.L. as gravely disabled because of his failure to provide for essential human needs and due to a severe deterioration of routine.

David Lyski, a designated mental health professional for Clark County Crisis Services, also testified about J.L.'s symptoms and diagnosis. Lyski reported that J.L. said he was living in a brothel and that people were tapping his phone. He was "fixated on sexual issues," including the rape allegation and a belief that he had extra chromosomes. Report of Proceedings (RP) at 14. Lyski diagnosed J.L. with paranoid schizophrenia.

J.L. testified that he became hospitalized because he believed he had been poisoned by a cookie and called 911. He said the EMTs scared him but did not rape him and that his "male organ does not work like a male organ." RP at 21. He denied threatening his father. He also thought that his therapist, Sharon Allen, was "like a girlfriend" to him and that another therapist affiliated with Allen was flirting with him. RP at 27.

The trial court granted the State's petition.

No. 43151-3-II

90-DAY INVOLUNTARY TREATMENT HEARING

The State filed a second petition, requesting a 90-day involuntary treatment period. The trial court held a hearing on February 16, 2012. Dehen again testified that J.L. has a diagnosis of schizophrenia. He stated that J.L.'s thoughts were clearing but that "delusional thought content still persists." RP at 41. For example, as recently as the day before the hearing, J.L. continued to report to Dehen that he ate a poisoned cookie. J.L. also continued to speak about an additional sexual organ. Dehen believed that J.L. remained gravely disabled because he was unable to care for his own needs. Dehen added that J.L. had voluntarily started a new medication two days before the hearing but that the medication takes weeks to achieve a therapeutic dose and requires careful monitoring of blood levels.

Lyski also testified. He noted that he had a history of observing J.L. because he worked with J.L. during two previous hospitalizations. Lyski agreed with Dehen that J.L. continued to show "delusional thought" and further agreed that J.L. remained gravely disabled. RP at 56. He observed that J.L. seemed to improve on his new medication but "it takes about two or three weeks before you get a good reading on how it's going to be working." RP at 59. He noted that J.L.'s mood remained volatile; J.L. could appear stable at times but also had periods of instability. The day before J.L.'s 90-day involuntary treatment hearing, for example, J.L. disrupted another person's hearing by trying to force his way into the courtroom.

J.L. testified and acknowledged that prior to his hospitalization, he had not been taking medication and was living "on the street." RP at 11. He, however, stated that he was willing to continue to take his new medication in the community and would follow up with mental health services if released (but would not return to Allen for therapy because "she was enforcing very strict gender roles"). RP at 72. J.L. believed that if he was released, he would live in a basement

3

apartment at his parents' house. He requested to be released "free of conditions." RP at 76. He also confirmed that he had been taking care of his daily sleep, hygiene, and food needs in the hospital.

The trial court granted the State's petition, finding that J.L. was "gravely disabled" because there has been a "[m]anifestation of severe deterioration in [J.L.'s] routine functioning." Clerk's Papers at 30, 32. The court stated that it feared that if it did not grant the petition, "we would get into a revolving door situation with [J.L.] coming in and out of treatment." RP at 92. The court added that it could not order a less restrictive alternative because it disapproved of releasing J.L. to his family home and because J.L. would not agree to any restrictions on his release. J.L. stated he wanted to appeal and press criminal charges for false imprisonment.

## ANALYSIS

J.L. challenges whether the State proved he was "gravely disabled." Br. of Appellant at 7.

STANDARD OF REVIEW

We will not disturb a trial court's finding that an individual is gravely disabled, as defined in RCW 71.05.020(17), if the finding is supported by "substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *In re LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986); *In re Det. of M.K.*, 168 Wn. App. 621, 629-30, 279 P.3d 897 (2012).

Where the State must prove its case by clear, cogent, and convincing evidence, the evidence must be more substantial than in the ordinary civil case in which proof need only be by a preponderance of the evidence. *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983). This means the ultimate fact in issue must be shown by evidence to be "'highly

probable.'" *Pawling v. Goodwin*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984) (quoting *In re Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

GRAVELY DISABLED

A person is "gravely disabled" if "as a result of a mental disorder,"[2] he or she either

(a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(17).

The trial court relied on the second definition. RCW 71.05.020(17)(b). When proceeding under the second definition of "gravely disabled," RCW 71.05.020(17)(b), a petitioner must

provide a factual basis for concluding that an individual "manifests severe [mental] deterioration in routine functioning". Such evidence must include recent proof of significant loss of cognitive or volitional control. In addition, the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

Furthermore, the mere fact that an individual is mentally ill does not also mean that the person so affected is incapable of making a rational choice with respect to his or her need for treatment. Implicit in the definition of gravely disabled under [former] RCW 71.05.020(1)(b) [1979] is a requirement that the individual is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment. This requirement is necessary to ensure that a causal nexus exists between proof of "severe deterioration in routine functioning" and proof that the person so affected "is not receiving such care as is essential for his or her health or safety."

---

[2] J.L. does not contest the proof that he suffers from a mental illness.

*LaBelle*, 107 Wn.2d at 208 (alteration in original).

Here, the State demonstrated that upon his admission to the hospital, J.L. was unable to provide for his own health and safety. J.L. was not taking medication, was living on the streets and was experiencing paranoid delusions about overdosing or being poisoned, being sexually assaulted, his therapist's ulterior motives, and his sexual health. Although J.L. asserts that his level of functioning improved during his initial 14-day period of involuntary commitment, the State presented substantial evidence that harmful consequences were likely to follow if the trial court did not order additional treatment. *LaBelle*, 107 Wn.2d at 208. As of the 90-day involuntary treatment hearing, J.L.'s behavior remained highly volatile and he continued to experience paranoia. While J.L. agreed to take medication voluntarily two days prior to his 90-day involuntary treatment hearing, his medication levels were not therapeutic and it would take up to a month to reach the correct dose. Accordingly, we hold that substantial evidence, which the trial court could reasonably have found to be clear, cogent, and convincing, supports its conclusion that J.L. is gravely disabled.

LESS RESTRICTIVE ALTERNATIVE

J.L. further argues that even if the trial court correctly found him gravely disabled, he should have been remanded to a less restrictive alternative. *See* RCW 71.05.320(2).[3]

The State has the burden of proving by clear, cogent, and convincing evidence that a less restrictive alternative was not in J.L.'s best interests. *In re Det. of T.A.H.-L.*, 123 Wn. App. 172,

---

[3] RCW 71.05.320(2) provides, in part, that if the court
finds that treatment less restrictive than detention will be in the best interest of the person or others, then the court shall remand him or her to the custody of the department or to a facility certified for ninety day treatment by the department or to a less restrictive alternative for a further period of less restrictive treatment not to exceed ninety days from the date of judgment.

187, 97 P.3d 767 (2004). A trial court has the option to order a less restrictive alternative even when the treatment is not available or there is no facility willing to assume the responsibility. *In re Det. of J.S.*, 124 Wn.2d 689, 699, 880 P.2d 976 (1994).

The trial court disfavored the least restrictive alternative option presented by J.L., that of living with his parents, although the court acknowledged that "there might be other less restrictive alternatives that might work." RP at 93. The court stated that something "in between" release to the family home and full commitment to a hospital "would be the most appropriate," but nothing had been "set up yet." RP at 89.

J.L. correctly argues that he did not have the burden of identifying a specific program able to accommodate him in order to obtain treatment in a less restrictive setting. *J.S.*, 124 Wn.2d at 700-01. Even assuming, however, that there was an appropriate less restrictive alternative to hospital detention, J.L. has no constitutional or statutory right to a less restrictive alternative. *J.S.*, 124 Wn.2d at 700-01. *J.S.* explains,

> RCW 71.05.320(1)[4] uses mandatory language (the court "shall"), but gives the court three options, to remand the individual to the custody of [Department of Social and Health Services], to a certified facility, *or* to a less restrictive alternative. *Thus, the court is not required under this provision to order the less restrictive alternative. . . .*
> Certainly RCW 71.05 expresses a public policy goal that treatment be offered in the least restrictive setting reasonably available. But to construe the statute to mandate less restrictive treatment options regardless of their existence or availability would be a strained interpretation, which is to be avoided.

---

[4] The current version of the statute effective July 26, 2009, addresses less restrictive alternatives in subsection (2) of RCW 71.05.320. As with subsection (1) cited in *J.S.*, subsection (2) still provides the trial court with three options: to remand a patient "to the custody of the department *or* to a facility certified for ninety day treatment by the department *or* to a less restrictive alternative for a further period of less restrictive treatment." RCW 71.05.320(2) (emphasis added).

No. 43151-3-II

124 Wn.2d at 701 (emphasis added). Therefore, the trial court was authorized to commit J.L. to a hospital regardless of whether treatment less restrictive than detention was in J.L.'s best interest. RCW 71.05.320(2).

Accordingly, we affirm the trial court's 90-day involuntary civil commitment order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

QUINN-BRINTNALL, J.

We concur:

HUNT, P.J.

BJORGEN, J.

8